IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § | |
| v. | § § | EP-11-CR-2724-PRM |
| **ROBERT A. TRUJILLO,**<br>    **Defendant.** | § § § | |

## ORDER DENYING MOTION TO SUPPRESS

On this day, the Court considered Defendant Robert A. Trujillo's (Defendant) "Motion to Suppress and Supporting Memorandum" (ECF No. 29) [hereinafter Motion], filed on December 21, 2011; the United States of America's (the Government) "Response to Defendant's Motion to Suppress" (ECF No. 33) [hereinafter Response], filed on January 5, 2012; Defendant's "Reply to the United States' Response to Defendant's Motion to Suppress" (ECF No. 36) [hereinafter Reply], filed on January 11, 2012, and the arguments and testimony offered at the Suppression Hearing held on January 31, 2012 (ECF No. 52) in the above-captioned cause. Defendant asserts that the evidence against him in this case should be suppressed because he was impermissibly searched and seized in violation of his Fourth Amendment rights. After due consideration, the Court is of the opinion that his Motion should be denied for the reasons that follow.

I.    **FINDINGS OF FACT**

During the Suppression Hearing, Jarrell Perry (Agent Perry), a Special Agent of the Drug Enforcement Agency (DEA), testified and was cross-examined; he was the only witness who testified at the hearing. On the date in question, Agent Perry and other DEA agents, in conjunction with local law enforcement officers, planned to engage in so-called "consensual encounters" with bus passengers, in an effort to intercept illicit drugs that might be transported from the bus terminal. This procedure is not uncommon and has been in practice for many years.

Agent Perry testified that he was the primary agent who participated in the encounter leading to Defendant's arrest.

The encounter with Defendant took place on October 12, 2011, on a commercial passenger bus parked at the El Paso Limousine bus terminal in El Paso, Texas, shortly before 7:00 p.m. The bus was scheduled to depart at 7:00 p.m. for Denver, Colorado, via Albuquerque, New Mexico.

At the time of the encounter, Agent Perry was not wearing a DEA uniform or any other insignia to identify himself as a law enforcement officer. He wore tennis shoes, shorts, and a short-sleeved polo-style shirt. He kept his DEA badge in his pocket, except on the occasions when he used it to identify himself as a law enforcement officer. He wore a firearm that was obscured under his untucked shirt. Additionally, Agent Perry wore a device that he used to record audio from his encounters with passengers. The other officers who boarded the bus were similarly equipped and dressed, in civilian-type clothing.

Agent Perry boarded the bus prior to the entry of any of the passengers. He stood near the rear of the bus as the passengers entered to take their seats and load their belongings in preparation for departure. As the passengers entered the bus, two other agents, Eduardo Chavez and Carlos Olivo, entered the front of the bus while agent Perry began approaching and questioning passengers. The bus engine was running, the air conditioning was on, and the door at the front of the bus remained open.

Agent Perry moved from the rear of the bus toward the front, stopping to talk with passengers and to ask for their consent to search their belongings. Prior to his encounter with Defendant, Agent Perry approached three other bus passengers. On the first two of those occasions, he asked for and received permission to search their carry-on bags. The third

passenger stated that he did not have a carry-on bag and Agent Perry did not ask for a search of any kind. During those three encounters, Agent Perry verbally identified himself as a police officer and removed his badge from his pocket to identify himself further; he told passengers that he was checking the bus for security. All of Agent Perry's interactions on the bus were visible to passengers on the bus who looked in his direction. During those encounters, Agent Perry's voice was calm and collegial.

When he initiated the encounter with Defendant, Agent Perry had no information or reason to suspect that Defendant was concealing contraband. Defendant was sitting in a window-seat with another passenger in the aisle seat next to him. Agent Perry positioned himself standing in front of the un-occupied aisle seat in the row directly in front of Defendant, facing Defendant and the rear of the bus.

The recordings[1] of the encounter and Agent Perry's testimony reveal that Agent Perry began the encounter with Defendant by greeting him and the passenger next to him; Agent Perry then identified himself as a police officer, confirmed that both Defendant and the other passenger spoke English, and asked for permission to speak with both men. After both men responded in the affirmative, Agent Perry inquired as to their final destinations and asked to search Defendant's carry-on bag for contraband. Defendant replied in the affirmative and Agent Perry unzipped the carry-on bag and searched it in Defendant's presence. Agent Perry found nothing he considered suspicious in the carry-on bag. He then thanked Defendant and returned the bag. Thereafter, the following exchange took place:

---

[1] During Agent Perry's testimony at the Suppression Hearing, both parties played audio recordings of his encounters with the other passengers and with Defendant. Both attorneys questioned Agent Perry as to the contents of the recordings.

Agent Perry: "And you don't have anything around your waist, or anything, weapons on your person, do you sir?"

Defendant: (Inaudible response)[2]

Agent Perry: "Would you consent to unzip your jacket for me? Would you consent for just a pat down search of your person, sir?" [The Court will refer to this as the "compound question."]

Defendant: "Not really, bu..."

Agent Perry: "Can you unzip your jacket for me please?" [The Court will refer to this as the "follow-up question."]

Defendant: (Pause) "Okay." Defendant then unzipped his jacket.

Agent Perry: "And can you just lift up your shirt so I can see under your shirt?" Thereafter, Defendant lifted up his shirt, at which point Agent Perry testified that he first observed black tape and then bundles around Defendant's waist. Agent Perry testified that this was the moment at which he concluded that Defendant was concealing contraband.[3]

Agent Perry: "Alright, can you stand up for me please."

Defendant: (Inaudible response)

Agent Perry: "Is that, is that tape around there sir?"

Defendant: "Yeah."

---

[2] Although the Court cannot determine exactly what Defendant said in response, it appears to the Court that Defendant responded in the negative.

[3] Agent Perry's testimony in this respect directly contradicts the assertion in his signed affidavit that he was suspicious of Defendant "based on Defendant wearing a warm up jacket." Resp. Ex. 1. At the beginning of the Suppression Hearing, the Government conceded that it did not have reasonable suspicion or probable cause prior to the point that Defendant lifted his shirt and Agent Perry observed the tape and bundles. During the Suppression Hearing, the Government informed the Court that Agent Perry did not draft the affidavit, but he discussed its contents with counsel for the Government and signed it. The Court credits Agent Perry's live testimony at the Suppression Hearing over the statements in his affidavit.

4

Agent Perry: "Ok. Can you stand up for me please? Do you have something strapped to your person?"

Defendant: "Uhhh . . . (inaudible response)"

Agent Perry: "Yes. Can you stand up for me please?" (Pause.) Defendant stands up. "Can you lift up your shirt please?" (It is unclear whether Defendant lifted up his shirt again.) "Go ahead turnaround and put your hands behind your back."

Thereafter, Agent Perry handcuffed Defendant and led him off the bus. Subsequently, DEA Special Agent Efren Sosa removed the bundles taped to Defendant's body. The parties have stipulated that the substance contained in the bundles is 4,448 net grams of cocaine. Stipulation of Facts, Jan. 30, 2012, ECF No. 42-1.

## II.   LEGAL STANDARDS

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.

### A.   Consensual Search

"'[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.'" *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002).

"When courts review a search justified by consent, there are four distinct issues." *United States v. Freeman*, 482 F.3d 829, 831 (5th Cir. 2007). "First, as a threshold matter, the government must demonstrate that the defendant did consent," a determination that is "based on the totality of circumstances." *Id.* at 831-32 (citations omitted). Second, if the government is successful in demonstrating consent, the Government must next demonstrate by a preponderance of the evidence that the defendant consented voluntarily. *Id.*; *United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011) (citation omitted) (providing the preponderance of the evidence standard). Third and fourth, the government must show that "the search was within the scope of consent" and that "the consenting individual had authority to consent."[4] *Freeman*, 482 F.3d at 832 (citations omitted). The Defendant has not challenged the Government on the third and fourth factors, nor would the record support such a challenge. Therefore, the Court will limit its analysis to the first and second factors.

### B.     Unlawful Seizure

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement 'through means intentionally applied.'" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis removed) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Brower v. Cnty of Inyo*, 489 U.S. 593, 597 (1989)). "When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence," generally, courts determine that a seizure has occurred if, "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not

---

[4] "Unlike the first two issues, scope and authority are not determined based on a totality-of-the-circumstances standard, but by a reasonable-officer standard." *Freeman*, 482 F.3d at 832.

free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). But where a defendant's "freedom of movement [is] restricted by a factor independent of police conduct—i.e., by his being a passenger on a bus," the "'free to leave' analysis is inapplicable." *Bostick*, 501 U.S. at 436. Instead, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.*; *see also United States v. Drayton*, 536 U.S. 194, 201 (2002) (same).

### III. ANALYSIS

#### A. Consensual Search

In his Motion and by way of the Suppression Hearing, Defendant argues that "he did not give consent to a search of his person," Mot. 5, and that after he responded, "Not really" to Agent Perry's compound question, the consensual encounter[5] ended when Agent Perry subsequently "order[ed]" Defendant to unzip his jacket, Reply 5. Essentially, Defendant challenges the first and second issues relevant to the Court's determination of consent, namely (1) whether the Government has shown that he consented and, (2) if there was an act of consent, whether Defendant consented *voluntarily*.

#### 1. Issue One: Existence of Consent

Regarding the first issue, the Court determines (1) that Defendant did not consent to unzip his jacket and to a pat-down search when Defendant responded, "Not really, bu..." in response to Agent Perry's compound question and (2) that Defendant consented to unzip his jacket when Defendant replied, "Okay" in response to Agent Perry's follow-up question asking, "Can you unzip your jacket for me, please?" Normally, the threshold question of the existence of consent arises when a defendant gives an ambiguous answer or the phrasing of a question

---

[5] Defendant does not concede that there was a consensual encounter; he brings this argument in the event that the Court rejects his argument that he was unlawfully seized. Mot. 5.

makes an answer ambiguous. *See Freeman*, 482 F.3d at 831 (citing *United States v. Price*, 54 F.3d 342, 346 (7th Cir. 1995) ("examining whether a defendant who responded 'Sure' meant 'Sure you can search' or 'Sure, I mind if you search'")). This is not the case where the threshold question is typically tested. Agent Perry's own testimony and the record support the conclusion that when Defendant said, "Not really, bu . . .," Defendant answered in the negative, and therefore, did not consent to the compound question. Equally evident is that, when Agent Perry paired down his compound question with his follow-up question seeking permission for a less intrusive form of a search, and Defendant replied, "Okay," Defendant meant that he consented to unzip his jacket. Accordingly, the existence of consent is not the issue in this case; rather, the issue is whether a statement of consent, preceded by a refusal to consent, evinces that consent was not voluntary. Therefore, the Court's determination hinges on the second issue, whether consent is voluntary.

### 2. Issue Two: Voluntariness of Consent

Courts in the Fifth Circuit use a six-factor test to assess voluntariness, examining:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. All six factors are relevant, but no single one is dispositive or controlling.

*United States v. Freeman*, 482 F.3d 829, 832-33 (5th Cir. 2007) (citation omitted) (applying the test to a non-custodial encounter); *see also United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011) (describing an additional multi-factor test applicable if a court determines that a defendant was illegally detained).[6]

---

[6] Given the Court's determination that Defendant was not impermissibly seized, *infra* III.B, the Court need not apply the additional test.

### a.    Factor two, Presence of Coercion

Because the second factor is the most critical in this case, the Court will address it first. Defendant argues that Agent Perry "did not take no for an answer" following Defendant's answer of, "Not really." Mot. 6.  Thereafter, Defendant argues that Agent Perry "ordered" Defendant to unzip his jacket, an act of coercion that rendered Defendant's subsequent "Okay" an involuntary act of consent. *Id.*

However, the Court is persuaded by the Government that Defendant voluntarily consented. Agent Perry asked Defendant, "Would you consent to unzip your jacket for me? Would you consent for just a pat down search of your person, sir?" Defendant responded, "Not really, bu . . .." In Agent Perry's follow-up question, he asked Defendant, "Can you unzip your jacket for me, please?" Defendant paused before responding, "Okay."

The evidence from the audio recording aided by Agent Perry's testimony, which served to add context, shows that Agent Perry did not order Defendant to unzip his jacket, use intimidation, or otherwise coerce Defendant into consenting. For one, the tone of Agent Perry's voice throughout the encounter was calm, unassertive, and congenial. Second, the voice inflection, low to high, and the syntax of the sentence, "Can you . . . please?," of Agent Perry's follow-up question demonstrate that he was asking a question, not giving an order. *Id.*  Third, the follow-up question is consistent with, and flows logically in, the sequence of events. It served to disambiguate the compound question in favor of a request for the lesser-intrusive of the two options in the prior compound question.[7] Fourth, Agent Perry's firearm was hidden from view and he did not brandish it, or make any threatening show of force. *See United States v.*

---

[7] During Agent Perry's testimony, he stated that he rephrased his compound question to ask for something less than a pat-down search.

9

*Mata*, 517 F.3d 279, 283 (5th Cir. 2008) (noting lack of coercion where officers did not have their weapons drawn and did not yell at or threaten the defendant).

Perhaps most importantly, although Agent Perry testified that he understood Defendant's statement of, "Not really," to mean, "no," he also testified that he understood that the question did not foreclose the possibility that Defendant would consent to something less intrusive than a pat-down search. Such a conclusion is justified under the circumstance given the compound question and, perhaps most importantly, the nature of the response. The audio recording of the encounter reveals that Defendant's response to the compound question was, "Not really, bu . . . .."[8] The Court determines that Agent Perry interpreted such an answer to invite a further question, as any reasonable person might have done. Defendant's response was ambiguous, particularly the "bu..." at the end of Defendant's response in which Defendant actually conveyed, "no, but." Defendant's statement implied that there might be some other circumstance which might bear upon consent. Given the nature and context of his statement, it was not coercive for Agent Perry to ask a single follow up question in the manner that he did.

While it may have been better for Agent Perry not to ask a compound question in the first place, "there are no *per se* rules" regarding a court's determination of voluntariness. *United States v. Drayton*, 536 U.S. 194, 207 (2002). Critically, this is not a case where a law enforcement officer intentionally uses compound questions to badger, mislead, or confuse. At the time when Defendant alleges the coercion began, Agent Perry had only asked one compound question and received just one, arguably qualified, negative response. Moreover, Defendant has not cited any case in which a court found coercion based on a law enforcement officer's use of a

---

[8] The parties' quotations from the audio recording included in their briefs do not include the "bu . . ." that the Court observes on the recording. The Court credits its own interpretation of the recordings.

compound question or where a law enforcement officer asked a single follow-up question to obtain consent after receiving a negative response.[9] The "informal and unstructured conditions" encountered by law enforcement officers in the course of their everyday investigatory functions are "a far cry from the structured atmosphere of a trial" where compound questions may be, but often are not, disallowed. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 231-32 (1973) (explaining that it "is impractical to impose on the normal consent search the detailed requirements of an effective warning" that would fully inform a individuals of their right to refuse a search).

### b. Remaining Five Factors

Regarding the first factor, as discussed in more detail, *infra* III.B, Defendant was not in custody at the time he consented to unzip his jacket. His interaction with Agent Perry was a mere encounter until Agent Perry observed tape and bundles on Defendant's person, an encounter that Defendant was free to terminate. His non-custodial status tends to show that his act of consent, by saying, "Okay," was voluntary. *United States v. Freeman*, 482 F.3d 829, 833 (5th Cir. 2007). Similarly, the third factor favors the Government. Defendant had already consented to the search of his carry-on bag, Mot. 5, and was cooperating with Agent Perry. Even after the point at which Defendant alleges that Agent Perry used coercive methods, Defendant unzipped his own jacket, lifted up his own shirt, and continued to respond to questions. Fourth, Defendant's negative response to the compound question reveals that he understood he was free

---

[9] The Court notes *United States v. Mata*, in which the defendant, also in non-custodial status, initially gave verbal consent to a search, but then refused to sign a "'Consent to Search' form" and said, "Maybe I should talk to my lawyer." 517 F.3d 279, 283 (5th Cir. 2008). Thereafter, officers continued their investigation, sought, and received further assistance in their investigation from the defendant and his wife. *Id.* In *Mata*, the Fifth Circuit upheld the district court's ruling that consent was voluntary despite the fact that the officers continued their investigation after Defendant arguably engaged in actions inconsistent with his act of consent. *Id.* at 291.

to withhold consent, another factor that favors the Government. Fifth, neither party has proffered any evidence specifically illuminating Defendant's educational background or intelligence. However, the fact that Defendant was actually aware of his right to refuse the request in Agent Perry's compound question diminishes the importance of this factor. Sixth, when Defendant consented to unzip his jacket, he may well have believed that the contraband taped to his abdomen would remain hidden below his shirt, as it apparently did, according to Agent Perry's testimony.

After analyzing the six factors relevant to determining the voluntariness of consent, the Court concludes that the Government has carried its burden of proving voluntariness. Under the totality of the circumstances, Defendant's initial refusal to consent to Agent Perry's request to unzip his jacket *and* to a pat-down search did not prohibit further questioning by Agent Perry or make such questioning coercive. Agent Perry was not intimidating or otherwise coercive in his interactions with Defendant.

### B.   Seizure

In his Motion, Defendant argues that he was faced with a "Hobson's choice." Mot. 4. He argues that his option of exiting the bus to avoid the police encounter was unrealistic given that the bus was set to depart within a few minutes of his encounter with Agent Perry and because choosing to exit the bus may have aroused the suspicion of the officers. Mot. 1. As counsel for Defendant noted during the Suppression Hearing, this is his weakest argument.

First, Defendant's argument that he could not refuse the request for a search or leave the bus without raising sufficient suspicion for a lawful detention is an assertion with no basis in the law. The Supreme Court has "consistently held that a refusal to cooperate" with a search, "without more," does not justify a seizure. *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

Further, the facts do not support Defendant's argument. As previously indicated, the Government concedes that it did not have sufficient suspicion to search or seize Defendant prior to the point at which Agent Perry noticed tape and bundles around Defendant's waist. Additionally, Agent Perry testified that he would have ended the encounter had Defendant asked him to do so.

Second, in his Motion, Defendant fails to distinguish the circumstances of his encounter with Agent Perry from prior Supreme Court precedent holding, under facts nearly identical to those before the Court, that passengers on a bus are not seized when law enforcement officers approach them for a consensual encounter. *See Drayton*, 536 U.S. 194, 203-04 (2002) (finding no seizure where officer wore civilian clothes, did not brandish his weapons, left the bus aisles open for egress, spoke to passengers one by one in a polite tone of voice, displayed his badge to identify himself, where other officers stood at the front of the bus but did not block the exit, and noting no seizure even when uniformed officers located themselves near exits). In fact, the gravamen of Defendant's argument was rejected over twenty years ago by the Supreme Court, when it stated that, during a consensual search, "the mere fact that [the defendant] did not feel free to leave the bus does not mean that the police seized him." *Bostick*, 501 U.S. at 436.

At the Suppression Hearing and in his Reply, Defendant seeks to reanimate his seizure argument. Defendant asserts that Agent Perry's compound question, followed by Defendant's negative response, then followed by Agent Perry's follow-up question, amounts to coercion that would prevent a reasonable person from feeling free to decline Agent Perry's request or otherwise terminate the encounter. Reply 5-6. For the reasons already stated, *supra* III.A.2, the Court finds that, under the facts of this case, Agent Perry's actions were not coercive. Furthermore, "[t]he reasonable person test . . . is objective and 'presupposes an *innocent*

person.'" *Drayton*, 536 U.S. at 202 (emphasis in original) (quoting *Bostick*, 501 U.S. at 438). Therefore, even if Defendant did not subjectively feel free to terminate the encounter or if anyone with over four kilograms of cocaine taped to his body might have found Agent Perry's follow-up question so coercive as to prevent him from terminating the encounter, such circumstances are irrelevant as to whether Defendant was seized in this case. An innocent person would not have perceived Agent Perry's follow-up question as having converted an otherwise consensual encounter on a bus into a scenario where he or she could not say "no" a second time, ask the officer to discontinue the encounter, relocate on the bus, or even exit the bus. Defendant's initial refusal and Agent Perry's follow-up questions are not so unusual to convert the otherwise germane police encounter on a bus into an unconstitutional seizure.

## IV. CONCLUSION

The Court concludes that the Government has met its burden of demonstrating voluntary consent because Agent Perry, and the other officers, did not coerce Defendant into consenting to the search that led to the discovery of contraband taped to Defendant's body. Further, Defendant has failed to distinguish the facts of his case from those cases where courts have determined that nearly identical encounters were not seizures protected by the Fourth Amendment. An objectively reasonable and innocent person faced with all the circumstances before Defendant would have felt free to terminate the encounter or decline the consensual search.

Accordingly, **IT IS ORDERED** that Defendant Robert A. Trujillo's "Motion to Suppress and Supporting Memorandum" (ECF No. 29) is **DENIED**.

**SIGNED** this **29th** day of **February, 2012**.

_____
PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE